# CHARLESTON.

MAUDRU v. HUMPHREYS, ADMR. *et al.*

Snbmitted January 21, 1919.   Decided February 4, 1919.

VENDOR AND PURCHASER—*Condition of Property—Party Sustaining Loss.*

Where a vendor, having good title and capacity to perform, makes a valid enforceable contract for the sale of land and, thereafter and before a deed is executed passing the legal title, a fire destroys a building thereon, without his fault or neglect, the loss is sustained by the purchaser.  In such case there is no implied warranty that the condition of the property at the time of sale shall continue until after deed is made.

Appeal from Circuit Court, Cabell County.

Suit in equity by Joseph Maudru against G. L. Humphreys, administrator, etc., James T. Mynes, and others.  Decree for plaintiff, and the administrator and James T. Mynes appeal.

*Reversed, and bill dismissed.*

*C. E. Copen,* for appellants.
*R. L. Blackwood* and *C. W. Freeman,* for appellee.

WILLIAMS, JUDGE:

This suit in equity was instituted by Joseph Maudru against the administrator and heirs at law of James T. Mynes, deceased, to recover damages for the loss of a house by fire, after a valid contract for the exchange of lands had been made between said Maudru and Mynes and before deeds were executed.  From a decree in favor of plaintiff, defendants prosecute this appeal.

Joseph Maudru resided in Colorado and James T. Mynes in Cuba.  The former owned a one-third undivided interest in a tract of about 3000 acres of land in Cuba, and the latter a number of houses and lots in the City of Huntington, West Virginia.  By a writing dated September 13, 1910, they contracted to exchange lands, Maudru agreeing to convey his Cuban property in exchange for certain ones of Mynes' houses and lots in Huntington, the properties to be conveyed

by general warranty deeds and free from all liens and encumbrances.

Mynes' deed to Maudru for the Huntington property bears date December 28, 1910, was acknowledged February 23rd and recorded March 23rd, 1911. The deed from Maudru to Mynes for the Cuban property was executed by J. S. Jump, attorney in fact for Maudru, April 8, 1911. The fire occurred January 24, 1911, without default of either party.

J. S. Jump, attorney in fact, knew the house had been burned before he executed Maudru's deed to Mynes, and says he told Mynes that Maudru would hold him responsible for the loss, but it does not appear what Mynes' reply was, if anything. C. L. Humphreys was looking after the Huntington property for Mynes until the exchange was completed, and produced a receipt for $55.00, bearing date May 1, 1911, signed by C. W. Freeman, who had become Maudru's agent to collect the rents. This receipt states that it is "For house rent collected for Joseph Maudru since transfer of J. T. Mynes to him," and Humphreys swears it included rent for the house that burned. Just when Maudru learned that the house was burned does not appear. But he wrote a letter dated Brush, Colorado, April 17, 1911, addressed to C. L. Humphreys, Huntington, West Virginia, in which he says: "I am informed that the big double house on one of the lots I recently bought from Mr. Mynes has burned down. Wish you would kindly forward me the insurance policy covering this property so that I can proceed for collection." And on the 24th of the same month he again wrote Humphreys, acknowledging receipt of a letter of April 20th, in which he was told by Humphreys that no insurance was carried by Mynes on any of his houses, and further said: "Also note that you have in your possession money collected for rent. Would ask that you turn this over to Mr. C. W. Freeman of your city whom I have engaged to look after the property and who will in the future collect rents." This evidence shows that Maudru collected rents after he had knowledge of the destruction of the house, if that fact is material. Apparently he supposed the loss was covered by fire insurance and he could get the benefit of it. But Mynes

carried no insurance, nor did his contract of sale obligate him to do so.

Mynes' title to all the Huntington lots seems to have been perfect, except lot No. 36, Block 189, not the one on which the burnt house was located. A defect in the title to this particular lot existed on account of the failure of J. F. Brown to unite with his wife Rebecca Brown in a deed from her bearing date January 17, 1898, to Eliza A. Mynes, through whom James T. Mynes traced title. This defect, however, was cured by a deed made by said Rebecca Brown and her husband direct to Joseph Maudru on April 12, 1911.

In September, 1914, Maudru instituted an action at law against C. L. Humphreys, administrator of James T. Mynes, deceased, to recover damages for the destruction of the house on the theory that its occurrence prior to the execution of the deed rendered the vendor liable, and on October 15, 1915, recovered a judgment for $1,500.00. No writ of error was taken to this judgment, and a fieri facias was issued and returned "No property."

The parties agreed that the evidence taken in the trial of that action might be read and considered as evidence by commissioner T. J. Ryan, to whom this cause was referred to report upon certain matters, and such evidence was read and considered by him. He found and reported that the house destroyed by fire was worth $1,500.00 as of October 15, 1915, the date of the judgment, to which sum he added interest to the date of his report, $172.50, and costs of the law suit, $198.10, thus making the sum of $1,870.60. The court overruled defendants' exceptions to the commissioner's report, confirmed the same and rendered the decree complained of.

The controlling question of law presented is, which party to the contract should bear the loss, neither being at fault?

James T. Mynes was an unmarried man and died intestate in December, 1912, leaving as his heirs at law his mother, four brothers and sisters and one half brother. C. L. Humphreys, a brother-in-law of deceased, qualified as his administrator. All the real estate in Huntington, which descended to the heirs, was sold by them prior to the bringing

of the action against the administrator, one lot to J. C. Henson, and the remaining ones to C. L. Humphreys and wife, the latter being one of the. heirs.

The present suit was instituted January 27, 1916, and the decree complained of pronounced October 27, 1917, decreeing $1,870.60 in plaintiff's favor, apportioning the liability among the several heirs and holding them personally liable for their respective proportions, and decreeing the whole thereof to be a lien on two tracts of land, aggregating 97-1/2 acres in Putnam County, inherited by the heirs, and a lien on certain other lots in Huntington likewise inherited by them, in which said C. L. Humphreys and Anna L. Humphreys, his wife, had purchased the interests of the other heirs of said James T. Mynes, deceased, and directed a sale of said lands to be made, if the decree was not paid in thirty days, selling first, the Putnam County land and second, the Huntington lots if necessary to pay the debt.

There being no privity of estate between the administrator and the heirs, the judgment against the former is not a lien on the lands in the hands of the latter, not even prima facie evidence of debt against them. *Board* v. *Callihan,* 33 W. Va. 209; and *Broderick* v. *Broderick,* 28 W. Va. 378. Still there is proper evidence in the case to prove the value of the house, if the loss thereof should fall on the vendor.

Although the authorities are not uniform on the subject, the general rule supported by the weight of the decisions is, that from the time of the execution of a valid contract for the sale of land, the purchaser is entitled to any enhancement in its value and, conversely, must sustain any loss happening thereto, without the fault or neglect of the vendor, after the execution of the contract of sale and before deed is delivered. The application of this rule depends upon the vendor's having good title and an enforceable contract. Here there was a defect in Mynes' title to one of the lots sold or exchanged, but it was curable and was, in fact, cured by the deed of April 12, 1911, from Brown and wife to Maudru.

After the execution of a valid contract of sale and before the legal title passes by deed, the vendor is regarded in equity as holding the legal title in trust for the vendee, and

the latter as holding the purchase money in trust for the vendor. The purchaser thereby acquires a vendable interest, an equitable estate which, at his death, descends to his heirs in the same manner as a legal estate. 1 Story on Eq. Juris., (14th ed.), Sec. 84; 39 Cyc. 1641; 2 Warvelle on Vendors, (2nd ed.), Sec. 842; *Brewer* v. *Herbert,* 30 Md. 301; *Sewell* v. *Underhill,* 197 N. Y. 168; *Thompson* v. *Norton,* 14 Ind. 187; *Marion* v. *Wolcott,* 68 N. J. Eq. 20; *Marks* v. *Tichenor,* 85 Ky. 536; *Walker* v. *Owen,* 79 Mo. 563; *Mannings* v. *Ins. Co.,* 123 Mo. App. 456; and *Woodward* v. *McCollum et al.,* 16 N. D. 42. Numerous other decisions could be cited, but the foregoing are sufficient. This is the rule in England also. See *Paine* v. *Meller,* 6 Ves. Jr. 350; and 1 Dart on Vendors and Purchasers, (7th ed.), 287. The foregoing authorities do not make the rule depend upon the transfer of the possession, but rest it upon the rights of the parties under the contract of sale and the ability of the vendor to comply therewith by making good title to the vendee.

There is no warranty or condition in the contract between Mynes and Maudru that the property should be in the same condition when the transaction is completed as it was when the contract was made; Mynes did not guarantee that its then existing condition would continue until the legal title had passed, nor is such guaranty to be implied; neither did the loss occur on account of any negligence or wrongful act of his. It was purely an accident, and in such case, equity places the loss upon the vendee, the equitable owner of the property.

The courts of some of the states, however, hold that the loss should fall on the vendor. See *Kares* v. *Covell,* 180 Mass. 206; *Wells* v. *Calnan,* 107 Mass. 514; *Wilson* v. *Clark,* 60 N. H. 352; *Phinizy* v. *Guernsey,* 111 Ga. 346; *Good* v. *Jarrard,* 93 S. C. 220; and *Powell* v. *D. S. & G. R. R. Co.,* 12 Ore. 488. Some of these cases, however, are distinguishable on other grounds and, therefore, are really exceptions to the rule rather than authority for a different one. Some of them turn on the point that the vendor, at the time of executing the contract, was not in position to make good title

free from encumbrances, according to the terms of his contract.

Having reached the conclusion that Maudru must sustain the loss in this case, it becomes unnecessary to consider other questions raised, for instance, whether or not Humphreys and wife were bona fide purchasers from the other heirs.

The decree must be reversed and plaintiff's bill dismissed.

*Reversed and bill dismissed.*